UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ASHLEY AELWEN LEACH,

    Plaintiff,

      v.

MR. BULT'S INC.,

    Defendant.

Civil Action No.

COMPLAINT
JURY TRIAL REQUESTED
INJUNCTIVE RELIEF REQUESTED

NOW COMES the Plaintiff, Ashley Aelwen Leach ("Plaintiff" or "Ms. Leach"), by and through her undersigned counsel, and complains against Defendant Mr. Bults, Inc. ("Defendant" or "MBI") as follows:

INTRODUCTION

1.     Defendant terminated Plaintiff's employment immediately after she reported that a coworker had physically and sexually assaulted her, provided recordings that corroborated the assault and the coworker's admissions, and disclosed that she is a transgender woman. Defendant's response to her reports, the timing, and Defendant's pretextual explanation for the termination establish that Defendant's actions violated Title VII of the Civil Rights Act, the Maine Human Rights Act, and the Maine Whistleblowers' Protection Act.

JURISDICTION AND PARTIES

1

2. This action arises under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; the Maine Human Rights Act ("MHRA"), 5 M.R.S. §§ 4551 *et seq.*; and the Maine Whistleblowers' Protection Act ("MWPA"), 26 M.R.S. § 831 *et seq.*

3. Plaintiff Ashley Aelwen Leach, formerly known as Chanler Leach, is a resident of Portland, Cumberland County, Maine.

4. Defendant Mr. Bults, Inc. is a privately-owned, for-profit Illinois corporation with headquarters in Burnham, Illinois.

5. Defendant also has a shop in Maine located at 100 Bark Mulch Drive, Auburn, Maine 04210.

6. There is more than $75,000 in controversy in this matter.

7. This Court has federal question jurisdiction over Plaintiff's Title VII claims pursuant to 28 U.S.C. § 1331.

8. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiff's federal claims.

9. This Court has diversity jurisdiction over all of Plaintiff's claims pursuant to 28 U.S.C. § 1332.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to these claims occurred in this District.

11. Upon information and belief, Defendant has about 1599 employees, which exceeds the requisite number of employees for coverage under Title VII and the MHRA during the relevant statutory period.

12.     On about March 26, 2025, Plaintiff filed a Charge of Discrimination with the Maine Human Rights Commission ("MHRC") and the Equal Employment Opportunity Commission ("EEOC") regarding the facts alleged herein.

13.     The MHRC assigned Charge No. E25-0109 to Plaintiff's state charge.

14.     The EEOC assigned Charge No. 16B-2025-00355 to Plaintiff's federal charge.

15.     On February 3, 2026, Plaintiff received notice of right to sue from the MHRC and from the EEOC.

16.     Plaintiff has exhausted all required administrative prerequisites as to the claims asserted herein.

<u>JURY TRIAL REQUESTED</u>

17.     Plaintiff requests a trial by jury for all claims and issues for which a jury is permitted.

<u>FACTUAL ALLEGATIONS</u>

18.     Defendant is a trucking company that specializes in hauling waste.

19.     Defendant describes itself as the largest long-haul waste transporter in the country.

20.     Plaintiff was hired by Defendant as a truck driver on or around December 18, 2023.

21.     Plaintiff was hired to work out of Defendant's Auburn, Maine shop.

22.     Plaintiff is a transgender woman.

23.     Prior to the events described below, Plaintiff had not specifically disclosed her gender identity to anyone working for Defendant. (She did tell one co-worker something to the effect that she "wasn't exactly cisgender".)

24. During her employment, Plaintiff performed her job duties and performed them well.

25. Plaintiff was never issued discipline.

26. Defendant never indicated to Plaintiff that she had engaged in misconduct of any kind.

27. In February 2025, Defendant's head mechanic from Vermont, Matt Burrington, was temporarily working out of Defendant's shop in Maine.

28. On February 12, 2025, Mr. Burrington began texting Plaintiff after she arrived back at the shop from a day of driving for the company.

29. Plaintiff had gone home and was starting her nightly routine while carrying on a phone conversation with Mr. Burrington.

30. During that call, Mr. Burrington told Plaintiff that he was going through a difficult divorce and desperately needed to talk with someone.

31. Although Plaintiff felt uncomfortable at the prospect, Mr. Burrington convinced her to come to his hotel. Plaintiff agreed because she was concerned for his safety and well-being and wanted to support her coworker.

32. Shortly after Plaintiff arrived at Mr. Burrington's hotel room, Mr. Burrington physically and sexually assaulted her.

33. Mr. Burrington pinned Plaintiff's arms down, grabbed her by the chest, grabbed her by her butt, smacked and squeezed her, picked her up, and threw her on his bed.

34. Mr. Burrington kept asking Plaintiff to "suck his dick" and attempted to force her head toward his crotch.

4

35.    Plaintiff defended herself by hitting Mr. Burrington in the crotch and the stomach multiple times.

36.    Plaintiff repeatedly forced Mr. Burrington off her and kept attempting to push him away.

37.    Once Plaintiff was free from Mr. Burrington's grasp, she began recording the interaction on her phone, including his ongoing requests for sexual favors and his efforts to entice her into his bed.

38.    Plaintiff was traumatized and humiliated by what had occurred.

39.    Mr. Burrington's actions were crimes and were unlawful.

40.    As a truck driver, Plaintiff routinely needed to show up early in the morning when it was still dark outside.

41.    Following the assault, Plaintiff was afraid that Mr. Burrington might be somewhere she could not see and that he might assault her as she was walking to her truck.

42.    Whenever Mr. Burrington was also working in the shop, Plaintiff was constantly afraid that he might assault and harm her.

43.    Plaintiff informed Marcel Roy of what had happened.

44.    Mr. Roy was the dispatcher, but he essentially functioned as the shop manager and the Plaintiff's day-to-day supervisor. She dealt directly with Mr. Roy about work related issues, such as calling out. Steven Dalpe supervised the drivers on paper, but Plaintiff and the other drivers rarely went to him for guidance or supervision.  Plaintiff believed that reporting to Mr. Roy would lead to an appropriate response by Defendant.

5

45.     Plaintiff informed Mr. Roy of the events of February 12, 2025, and told Mr. Roy that she was afraid of another potential assault as she walked to her truck or performed her pre-trip duties.

46.     Plaintiff made that report to shed light on the situation and in hopes that Defendant would take appropriate steps to address the unlawful actions by Mr. Burrington and eliminate the ongoing hostile work environment.

47.     Mr. Roy suggested that Plaintiff confront Mr. Burrington directly about what had occurred, and that she record the conversation.

48.     Plaintiff took Mr. Roy's advice. They both thought that recordings would be necessary in getting the company to take action.

49.     She also recorded her conversations with Mr. Burrington in case he decided to attack her again.

50.     When Plaintiff mentioned details of the assault to Mr. Burrington, he repeatedly admitted fault. Mr. Burrington stated, among other things, "I asked for stuff I should not have," "Sorry, I was a hundred percent in the wrong," and "I was wrong that night. I feel fucking horrible. I don't normally do that… I don't do that. I had a lot of shit on my mind... That's like a very rare once in my fucking lifetime."

51.     Mr. Burrington did not dispute the explicit details of the encounter and continued to apologize for his behavior.

52.     At that point, Plaintiff did not know what to do. Plaintiff was afraid to report the harassment to Human Resources or upper management because she feared retaliation. Plaintiff was also afraid to report the assault to law enforcement because she feared how Mr. Burrington would react.

6

53. Plaintiff uploaded the recordings she had made to Dropbox so that she could send them to upper management or Human Resources.

54. On Monday, February 24, 2025, Plaintiff sent these recordings to Mr. Roy in hopes that he could advise or assist her in the complaint process.

55. At some point, Mr. Burrington went to Steve Dalpe and accused Plaintiff of harassing him.

56. When Mr. Dalpe questioned Plaintiff about Mr. Burrington's accusations, Plaintiff informed Mr. Dalpe that there was recorded evidence that she had been sexually assaulted, and that Mr. Burrington had admitted to the encounter.

57. Plaintiff made that report to shed light on the situation and in hopes that Defendant would take appropriate steps to address Mr. Burrington's unlawful actions and eliminate the ongoing hostile work environment.

58. On Wednesday, February 26, 2025, Plaintiff sent the video and voice recordings to Mr. Dalpe.

59. Mr. Dalpe said there was "absolutely nothing" he could do. Mr. Dalpe told Plaintiff that she should "remain professional" and "try to relax about it."

60. It was clear to Plaintiff that Mr. Dalpe was not going to take her concerns seriously.

61. Plaintiff believed that she was being subjected to a hostile work environment by having to continue to work in fear of the man who harassed her.

62. On the afternoon of February 26, 2025, Plaintiff escalated her complaint by sending an email to Tricia Deblock and Marla Schultz in Human Resources; Shane Schmidt,

the head mechanic for the corporate shop in Illinois; Vice President David Huitsing; and the owner/CEO Jim Bult.

63.     In her February 26, 2025, email, Plaintiff outlined what had occurred, provided evidence of the attack and Mr. Burrington's admissions, explained that Mr. Dalpe was not taking her report seriously, and stated that she felt like she was being subjected to a hostile work environment.

64.     Plaintiff made clear in that email that she wanted to feel safe at work because she was reasonably scared of being alone in the dark directly near the man who attacked her.

65.     In that email, Plaintiff stated that she was a transgender woman.

66.     Upon information and belief, this was the first time that Plaintiff's gender identity was disclosed to Ms. DeBlock, Ms. Schultz, Mr. Huitsing, Mr. Schmidt and/or Mr. Bult.

67.     Plaintiff sent the February 26, 2024, email to shed light on the harassment she endured and in hopes that Defendant would take appropriate steps to address Mr. Burrington's unlawful actions and eliminate the ongoing hostile work environment and address what Plaintiff reasonably believed to be an inadequate and legally deficient response by Mr. Dalpe.

68.     Plaintiff received no response from Defendant's management, other than automated responses stating that the email for Mr. Bult was wrong or prohibited and that Mr. Huitsing was out of the office.

69.     Plaintiff then decided to report the incident to local law enforcement, and a police report was filed.

70.    On the night of February 26, 2025, Mr. Roy told Plaintiff that there was not enough work for everyone and that she would be staying home the following day, February 27, 2025.

71.    On February 27, 2025, Plaintiff received a call from Mr. Dalpe asking her to meet him at an office on the property where the shop was located.

72.    That meeting was held by Mr. Dalpe and Defendant's Regional Manager, Jason Woodward.

73.    During the meeting, Plaintiff was informed that she was being terminated.

74.    Mr. Woodward stated plainly that Plaintiff was not fired for poor performance or for doing anything wrong.

75.    Mr. Woodward told Plaintiff, "It sounds like you and [Mr. Burrington] have a personal situation" and that "we can't be a part of it."

76.    Mr. Woodward told Plaintiff, "What we're going to have to do is [terminate both of you] at will and hopefully you guys can personally work it out and then come back in a month or something."

77.    Plaintiff asked Mr. Woodward, "So, I'm being terminated for reporting my coworker for sexual assault?"

78.    Mr. Woodward replied, "I don't know the reason… every company in Maine or Vermont, whatever, we're at will companies like we can [terminate] at will anybody at a certain time and we don't have to give a reason and that's all I have really. I'm really sorry."

79.    Defendant's HR Director, Tricia DeBlock, signed Defendant's position statement to the MHRC.

80.    Ms. DeBlock admitted that Plaintiff was a very good employee and Defendant had been very satisfied with her job performance.

81.    Ms. DeBlock was aware that Plaintiff is transgender yet she referred to Plaintiff using male pronouns throughout the position statement.

82.    The misgendering by Ms. DeBlock, as Defendant's representative, is strong evidence of animus towards Plaintiff because she is a transgender woman and is also strong evidence of motive.

83.    Ms. DeBlock asserted that the recordings Plaintiff submitted "appeared to be an attempt by Chanler (sic) to highlight someone else's behavior by repeatedly baiting someone at an undisclosed location on personal time."

84.    Ms. DeBlock, as Defendant's representative, blamed Plaintiff, the victim of sexual and physical assault and harassment, for the unlawful actions towards her which reflects that it is Defendant's view and practice to treat the victims and perpetrators of sexual assault/harassment as equally culpable.

85.    Defendant's practice of treating the perpetrator and the victim of sexual assault/harassment the same directly violates federal and state law.

86.    Ms. DeBlock further asserted that Plaintiff was terminated because of the "unacceptable position he (sic) put himself (sic) and me in by sending MBI these recordings."

87.    Ms. DeBlock, as Defendant's representative, acknowledges that Plaintiff was terminated for being the victim of sexual assault and harassment and was terminated for reporting these things.

88.    This is direct evidence of discrimination and retaliation.

89.    Defendant's practices would be inappropriate for an employer of any size.

10

90.    Where Defendant has more than 1,500 employees and is, by its own assessment, the largest long-haul waste transporter in the country, its blatantly discriminatory and retaliatory practices are particularly egregious.

91.    If Plaintiff had not been subjected to sexual assault and harassment by a coworker she would not have been terminated.

92.    If Plaintiff had not reported the sexual assault and harassment by a coworker she would not have been terminated.

93.    Defendant terminated Plaintiff's employment immediately after she reported sexual assault and harassment by a coworker; provided recordings corroborating her report, objected to a hostile work environment; and disclosed that she is a transgender woman.

94.    As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer lost wages, lost benefits, stress, humiliation, loss of enjoyment of life, and other damages.

95.    Defendant knowingly and/or recklessly violated Plaintiff's state and federal rights.

96.    Defendant's knowing violation of Plaintiff's rights is demonstrated, in part, by the admissions in its MHRC Submission that it terminated Plaintiff because she was subjected to unlawful sexual assault and harassment and because she reported it.

97.    Defendant's blatant, knowing violations of federal and state law warrants a substantial award of punitive damages to make clear to Defendant that its discrimination and retaliation is unacceptable and to ensure that Defendant will not engage in the same unlawful conduct towards its employees in the future.

98.    Plaintiff is entitled to all legal and equitable relief available under the statutes identified in this Complaint.

**RETALIATION CLAIMS**

<u>COUNT I: TITLE VII – RETALIATION</u>

99.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 98 as if fully set forth herein.

100.     Title VII prohibits retaliation against an employee because she engaged in activity protected by Title VII.

101.     Defendant retaliated against Plaintiff because she engaged in activity protected by Title VII, including reporting sexual harassment and a hostile work environment and providing recordings that corroborated her complaints and Plaintiff's activity was a factor that made a difference in Defendant's decision to take adverse actions against her.

<u>COUNT II: MHRA – RETALIATION</u>

102.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 101 as if fully set forth herein.

103.     The MHRA prohibits retaliation against an individual for opposing conduct made unlawful by the MHRA or for otherwise exercising rights protected by the MHRA.

104.     Defendant retaliated against Plaintiff because she engaged in activity protected by the MHRA, including reporting sexual harassment and a hostile work environment and providing recordings that corroborated her complaints and Plaintiff's activity was a factor that made a difference in Defendant's decision to take adverse actions against her.

<u>COUNT III: MAINE WHISTLEBLOWERS' PROTECTION ACT</u>

105.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 104 as if fully set forth herein.

106.     The MWPA prohibits an employer from discharging or otherwise discriminating against an employee because the employee, in good faith, reports what the employee has reasonable cause to believe is a condition or practice that would put at risk the health or safety of that employee or any other individual, or because the employee reports conduct the employee reasonably believes violates the law.

107.     Defendant violated the MWPA by retaliating against Plaintiff because she reported that a coworker had sexually assaulted her, reported that Defendant was failing to address the situation, and sought to shed light on conduct she reasonably believed was unlawful and unsafe and Plaintiff's protected activity was a factor in Defendant's adverse actions.

**DISCRIMINATION CLAIMS**

COUNT IV: MHRA – GENDER IDENTITY AN SEX DISCRIMINATION

108.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 107 as if fully set forth herein.

109.     The MHRA prohibits discrimination in employment because of gender identity.

110.     Defendant discriminated against Plaintiff because of her gender identity. Plaintiff's gender identity was a factor that made a difference in Defendant's decision to terminate her employment.

111.     If Plaintiff were cisgendered she would not have been subjected to the unlawful discrimination.

COUNT V: MHRA – SEX DISCRIMINATION

112.     Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 111as if fully set forth herein.

113.     The MHRA prohibits discrimination in employment because of sex.

13

114.    Defendant discriminated against Plaintiff because of sex, including because she is a transgender woman and identifies as female. Plaintiff's sex was a factor in Defendant's decision to terminate her employment.

115.    If Plaintiff were cisgendered she would not have been subjected to the unlawful discrimination.

COUNT V: TITLE VII – SEX DISCRIMINATION

116.    Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 115 as if fully set forth herein.

117.    Title VII prohibits discrimination in employment because of sex.

118.    Defendant discriminated against Plaintiff because of sex, including because she is a transgender woman and identifies as female. Plaintiff's sex was a factor in Defendant's decision to terminate her employment.

119.    If Plaintiff were cisgendered she would not have been subjected to the unlawful discrimination.

PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendant to be in violation of Plaintiff's rights;

B. Enjoin Defendant, its agents, successors, employees, and those acting in concert with it from continuing to violate Plaintiff's rights;

C. Order Defendant to reinstate Plaintiff or award front pay to Plaintiff;

D. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendant's unlawful conduct;

E. Award equitable relief for back pay, lost benefits, and prejudgment interest;

14

F. Award compensatory damages in an amount to be determined at trial;

G. Award punitive damages in an amount to be determined at trial;

H. Award attorneys' fees, including legal expenses, and costs;

I. Award prejudgment interest;

J. Permanently enjoin Defendant from engaging in employment practices that violate the laws at issue in this case;

K. Require Defendant to post a notice in all of its workplaces of the verdict and a copy of the Court's order for injunctive relief;

L. Require that Defendant train all management-level employees on the protections afforded by Title VII, the MHRA, and the MWPA;

M. Require that Defendant place a document in Plaintiff's personnel file explaining that Defendant unlawfully terminated Plaintiff because of unlawful discrimination and retaliation; and

N. Grant to Plaintiff such other and further relief as may be just and proper.


Respectfully submitted,

Dated: March 17, 2026                   /s/ Chad T. Hansen_____
                                        Chad T. Hansen
                                        Attorney for the Plaintiff

                                        EMPLOYEE RIGHTS GROUP
                                        92 Exchange Street 2nd floor
                                        Portland, Maine 04101
                                        Tel. (207) 874-0905
                                        Fax (207) 874-0343
                                        Chad@EmployeeRightsLaw.Attorney